**FEDERAL DEPOSIT INSURANCE CORPORATION, Plaintiff,**

v.

**S. N. ARONECK and Arrow Investment Corporation, Defendants and Third Party Plaintiffs,**

v.

**HENRY SIMS SECURITIES, INC., Third Party Defendants.**

Civ. A. No. 76–721.

United States District Court, D. South Carolina, Columbia Division.

Nov. 21, 1979.

---

J. Randolph Pelzer, Pelzer & Chard, Charleston, S. C., for plaintiff.

George Hunter McMaster, Tompkins, McMaster & Thomas, Harvey Golden, Columbia, for Aroneck.

Fred Fanning, Orangeburg, S. C., for Sims.

## ORDER

CHAPMAN, District Judge.

This matter is before the Court upon motion by the plaintiff Federal Deposit Insurance Corporation (hereinafter referred to as "Plaintiff" or "FDIC") for summary judgment against the defendants S. N. Aroneck and Arrow Investment Corporation (hereinafter referred to as defendants Aroneck and Arrow) pursuant to Rule 56 of the Federal Rules of Civil Procedure. This rule provides that summary judgment may be granted when there is no genuine dispute as to any issue of material fact and a party is entitled to judgment as a matter of law. After due notice, this motion was heard on October 16, 1979. Present on behalf of the plaintiff was Mr. J. Randolph Pelzer, and appearing on behalf of the defendants was Mr. George Hunter McMaster. The plaintiff has filed a memorandum, reply memorandum, and supplemental brief in support of its motion, along with an affidavit of Donald J. Lubitz, its employee in charge of the liquidation of the affairs of American Bank and Trust. The defendants have filed a memorandum and two response memoranda, along with the affidavit of S. N. Aroneck, in opposition to plaintiff's motion. It is apparent from the pleadings, briefs, depo-

sitions, and other discovery material submitted by the parties that there are no material issues of fact in dispute in the present case and the plaintiff is entitled to judgment as a matter of law.

Plaintiff is the owner and holder of a promissory note originally given by defendant Aroneck to the American Bank and Trust (hereinafter referred to as AB&T), a state bank which was closed and placed into receivership on September 30, 1974. This note is dated September 3, 1974, in the original principal amount of Thirty-Four Thousand Five Hundred and No/100 ($34,-500.00) Dollars with an annual percentage rate of eight (8) percent. Plaintiff acquired this note as successor to AB&T. The note is in default and demand has been made upon the defendants for payment. Plaintiff also seeks from defendant Arrow Investment a note and mortgage of one Henry Martin dated January 31, 1974, which Arrow assigned to FDIC as collateral for Aroneck's promissory note on May 9, 1975.

Defendants admit the jurisdiction of this court, admit plaintiff is a federal agency, admit the residency of defendants, admit the execution and delivery to AB&T of the $34,500.00 note, and admit that demand for payment has been made and not met. Defendants demand strict proof that plaintiff purchased the note from the receivership of AB&T, and deny that they owe the principal amount of the note plus interest and a reasonable attorney's fee as set forth in the complaint. The truth of these allegations in FDIC's complaint is established by the uncontested affidavit of Donald J. Lubitz. Defendants Aroneck and Arrow Investment assert three defenses. First: that the note in question was the renewal of earlier notes given by Aroneck to AB&T upon which usurious interest was charged and received, and therefore this note should also be treated as usurious. Second: that the note was an integral part of the purchase of AB&T stock by Aroneck after he was fraudulently misled by an officer of AB&T as to the value and safety of this stock in contravention of various federal securities laws, and defendant should be allowed to rescind the purchase of this AB&T stock, and cancel the indebtedness created by the note. Finally, that defendant was entitled to rescind on the basis that the note was secured indirectly by margin stock in contravention of Federal Reserve Regulation U, 12 C.F.R. § 221 et seq., (1972). This third defense was dropped by the defendant at oral argument. The Court will first detail the undisputed facts in this case and then address the question of the sufficiency of Aroneck's defenses to FDIC's claim.

On June 7, 1973, Aroneck purchased two thousand five hundred and fifty (2,550) shares of stock in American Bank and Trust Shares, Inc. (hereinafter "ABTS"), parent company of AB&T. The actual transfer of ownership of these shares of stock was handled by Mr. William Southworth, an employee and executive officer of AB&T. Southworth arranged for Aroneck to purchase two thousand and fifty (2,050) shares of ABTS stock from Henry Sims Securities, Inc., which shares were formerly registered in the name of AB&T. The remaining five hundred (500) shares, which were formerly registered in the name of a private investor, were purchased through Furman Securities, Inc. The total purchase price for the 2,550 shares was Seventy-Two Thousand Six Hundred Seventy-Five and No/100 ($72,-675.00) Dollars ($28.50 per share). Of this amount, Forty-Seven Thousand and No/100 ($47,000.00) Dollars came from a loan given by First Union National Bank of North Carolina. The balance of the purchase price, Twenty-Five Thousand Six Hundred Seventy-Five and No/100 ($25,675.00) Dollars was financed through an unsecured note given to AB&T by Aroneck. Prior to this purchase, on January 10, 1973, Aroneck gave AB&T a note for Fifteen Thousand ($15,000.00) Dollars with interest at the rate of seven percent (7%) per annum. The September 3, 1974 note of Thirty-Four Thousand Five Hundred ($34,500.00) Dollars, the subject of this action, is a renewal of the June 7, 1973 note and the January 10, 1973, note, less principal payments. The assignment of the Henry Martin note referred to earlier was given to FDIC as collateral security following a renewal of the note dated June 7, 1973.

The purchase of 2550 shares by Aroneck represented his second venture into the world of ABTS stock. He has previously bought one thousand (1,000) shares of this stock for approximately Twenty ($20.00) Dollars per share in December of 1970 upon the recommendation of Cirimba Amick and Mr. Southworth, officers of AB&T. He sold these shares in 1971, again following the recommendation of Southworth, for approximately Thirty-Five and 75/100 ($35.75) Dollars per share, thus making a profit on the 1,000 shares of ABTS stock of about Fifteen Thousand and No/100 ($15,000.00) Dollars.

These represent the undisputed facts in this case. While there are disputed issues of fact concerning the circumstances surrounding Aroneck's purchase of the 2550 shares on June 7, 1973, none of these issues are material to this case as required by Rule 56. Aroneck alleges that he purchased the ABTS stock following certain representations made to him by Southworth about the "safety" of the purchase. According to Aroneck, he met with Southworth at the AB&T office in Orangeburg, S. C., in the spring or early summer of 1973. He had originally stopped in the office just to say. "Hello" to Mr. Southworth. He has referred to this meeting in Orangeburg in his depositions as merely a public relations visit. At this time, Aroneck claims Southworth approached him about buying some ABTS stock. Aroneck purportedly told Southworth that he did not have the money to make such a purchase, whereupon Southworth allegedly told him "not to worry" because he (Southworth) "would take care of the financing." (Deposition of S. N. Aroneck, September 23, 1977, at page 11.) Aroneck also claims Southworth told him that he would see to it that Aroneck would be taken care of as he had been on his previous purchase of ABTS stock in December of 1970, and that Aroneck would not be "hurt" by purchasing the stock. He alleges that throughout his dealings with AB&T, Southworth was always very enthusiastic about the future of AB&T and the security of the ABTS stock. Aroneck interpreted these purported statements by Southworth to mean that Southworth would warn him about any adverse changes in the financial status of AB&T and the ABTS stock in time for Aroneck to sell his shares without losing any money. Southworth has denied that he ever promised to provide Aroneck with inside information on the condition of the ABTS stock in order to protect Aroneck's interest. Herein lies the disputed issue of fact. This dispute is not material. If the Court were to believe Southworth, then Aroneck would not have a viable claim against FDIC based on violation of the federal securities laws, since there had been no material misrepresentations or omissions as to the condition of the ABTS stock. If, however, the Court adopted Aroneck's version of the stock purchase, Aroneck would be estopped from asserting a claim against FDIC even if he could prove a violation of the securities laws, because he was *in pari delicto* with Southworth. The Court will address the question of the applicability of the defense of *in pari delicto* following the discussion of defendant's first counterclaim.

■ In their first counterclaim, defendants assert that the note in question should be treated as usurious pursuant to Section 34–31–50 of the South Carolina Code of Laws (1976), because it is a renewal of earlier notes given by Aroneck to AB&T upon which usurious interest was charged and collected. South Carolina Code § 34–31–30 provides that interest upon notes for amounts up to Fifty Thousand Dollars may not exceed eight percent (8%). The affidavit of defendant Aroneck reveals that on several occasions during 1973 and 1974 he did give notes to AB&T, none larger than $50,000, which were usurious on their face because the interest rate was ten percent (10%). AB&T did, in fact, collect usurious interest pursuant to these notes on four occasions. The note which is the subject of this action is a renewal of these earlier notes. The uncontested affidavit of Donald J. Lubitz shows that FDIC purchased this note from the receivership of AB&T, and that the FDIC has collected no interest whatsoever, either as receiver or in its separate corporate capacity as purchaser of the

note, in excess of the rate of eight percent per annum. The law in South Carolina is clear on the point that the conservator-receiver of a bank is not liable in respect of usurious interest collected by the bank prior to its appointment, although it would be liable for usurious interest collected after its appointment. *Johnson v. Groce*, 175 S.C. 312, 179 S.E. 39 (1935). Since AB&T was a state bank, the decision of the South Carolina Supreme Court on South Carolina usury law controls in this case.

■ Support for the decision in *Groce* can be found in cases dealing with the National Bank Act which have interpreted that Act's provision on usurious interest in the same manner as the South Carolina provision, namely to prohibit the imposition of the statutory penalty upon the receiver of a bank. In *Anderson v. Herschey*, 127 F.2d 884 (6th Cir. 1942) the Court of Appeals for the Sixth Circuit explained the rationale for the rule:

> This construction is supported by sound practical considerations. A national bank during normal operation could pay the amount of the double penalty from its profits so that its creditors and depositors would not suffer. But when the bank is in receivership any depletion of the estate over and above the amount actually retained by the receiver in violation of Title 12, U.S.C. § 86, 12 U.S.C.A. § 86, will affect creditors and depositors who were in no way connected with or responsible for the usurious transactions. The purpose of the punitive damage provision which is to prevent the repetition of the offense, does not exist when the bank is in process of liquidation and its activities are being progressively curtailed.

FDIC, then cannot be held liable for the usurious interest collected by AB&T on Aroneck's notes prior to AB&T being placed in receivership, and therefore, defendants' first counterclaim must fail as a matter of law.

■ As noted earlier, if the Court were to adopt Aroneck's version of the circumstances surrounding his purchase of 2550 shares of ABTS stock, then defendants

would be estopped from asserting their second counterclaim because of the doctrine of *in pari delicto*. The majority of courts, including the Fourth Circuit Court of Appeals, have recognized the common law in pari delicto defenses to a fraud action based on the Federal Securities Act. See, e. g., *Fogarty v. Security Trust Co.*, 532 F.2d 1029 (5th Cir. 1969); *Kuehnert v. Textar Corp.*, 412 F.2d 700 (5th Cir. 1969); *Tarasi v. Pittsburgh National Bank*, 555 F.2d 1152 (3d Cir. 1977); *Malamphy v. Real-Tex Enterprises, Inc.*, 527 F.2d 978 (4th Cir. 1975); and *Lawler v. Gilliam*, 569 F.2d 1283 (4th Cir. 1978). In *Fogarty v. Security Trust Co.*, supra, the Court formulated the following test for determining whether the defense of in pari delicto should be allowed in securities cases:

> (1) the Fault of the parties must be "clearly mutual, simultaneous, and relatively equal;" and
>
> (2) the effect on the investing public or on the implementation of important features of the regulatory scheme must be so small as to permit the Court to conclude that allowing the defense would not interfere with [regulatory] objectives.

Both elements of the test must be satisfied for the defense to be allowed. The Fourth Circuit adopted this test in *Lawler v. Gilliam*, supra, and further noted, as have other circuits, that the first element of the test can be satisfied if the Court finds a "tipper-tippee" relationship existed between the parties. This Court finds that if it adopts Aroneck's version of the facts, then such a relationship existed between Aroneck and Southworth at the time they arranged for Aroneck's purchase of the 2550 shares of ABTS stock in 1973. Defendant has admitted that his purchase of the stock was contingent upon Southworth's agreement, as officer of AB&T, to provide him with inside information on the condition of the stock in order that he could sell his shares at the most opportune moment. He has further testified by way of deposition that a similar arrangement with Southworth in 1971 enabled him to make approximately Fifteen Thousand and No/100 ($15,000.00) Dollars on the sale of one thousand (1,000) shares of

ABTS stock. Clearly Aroneck's role in this stock purchase transaction was that of a tippee since he planned to use inside information provided him by the tipper Southworth to protect his investment.

One of the leading cases on the application of the doctrine of in pari delicto to suits by tippees against tippers is *Tarasi v. Pittsburgh National Bank*, supra. In *Tarasi*, one of the plaintiffs, William Tarasi, was in a position very similar to that of Aroneck. He had purchased stock in a corporation on the belief that the stock's value would double in the near future because the company was supposed to merge with another successful firm. The information on the proposed merger was given to Tarasi by an officer in the Pittsburgh National Bank, who had represented that the data was "inside information", and not to be repeated to anyone. Tarasi, like Aroneck, knew very little about the securities market, and there is no indication he knew he was violating the securities laws by using this inside tip to his advantage. When the proposed merger failed to materialize, the value of Tarasi's stock plummeted, and he brought suit against the Bank and the officer who had provided him with the inside information. The Court held that Tarasi was precluded by the doctrine of in pari delicto from recovering against the tipper officer since he had wrongfully used inside information in purchasing the stock.

Like the plaintiffs in *Tarasi*, defendant Aroneck argues that his conduct does not meet the equality benchmark required by the first part of the *Fogarty* test since he was not of "substantially equal fault" because he never actually conspired to violate the securities laws—he merely agreed to rely on Southworth's promise that he wouldn't be hurt by the ABTS stock purchase. In rejecting a similar argument, the Court in *Tarasi* noted:

> It is true that the parties are not true co-conspirators in the usual sense, since a joint program of illegal conduct was never agreed upon or even contemplated. Nonetheless the litigation contains an important element, absent in *Perma Life*, that, we believe, makes it an instance of joint wrong-doing—specifically, voluntary illegal conduct on the part of the plaintiffs.

This rationale is also applicable in this case, for while it is true that Aroneck may not have been a conspirator with Southworth in the traditional sense of the word, he did engage in voluntary illegal conduct by agreeing to accept inside information from Southworth in order to protect his investment.

Defendant further argues that the second element of the *Fogarty* test prohibits application of the in pari delicto defense. This second element focuses on the effect the application of the defense has on the regulatory objectives of the securities laws. Aroneck contends that *Lawler v. Gilliam*, supra, stands for the proposition that the doctrine of in pari delicto encumbers the securities laws efforts at enforcing public policy. This reliance on *Lawler* is misguided. The Fourth Circuit merely held that under the facts before it in that particular case, application of the doctrine would be inappropriate because none of the plaintiffs had violated or conspired to violate the securities laws. In such a situation, the regulatory objectives behind the securities laws would be frustrated by applying the in pari delicto defense. But such is not the case in the situation before this Court, for here Aroneck, unlike the plaintiff in *Lawler*, clearly agreed with Southworth to violate the securities laws by agreeing to use the inside information from Southworth to limit his risk in purchasing the ABTS stock. Under these circumstances, application of the in pari delicto defense would actually further the aims of the securities laws by having the effect of deterring violations by "tippee" like Aroneck. As the Court explained in *Kuehnert v. Texstar Corp.*, supra:

> It is true that if a tippee has no remedy against an insider's private falsehoods, little deterrent against such conduct will exist; the insider may have free rein. But, as against this, there is another danger. If a tippee can sue he has, in effect, an enforceable warranty that secret information is true. It is then he that will have free rein. If what he is told is false,

he can recover against his informer. If it is true, he will, of course, be liable to his vendors or vendees, but here he may well be protected by the difficulties of discovery. It may be relatively easy to trace insiders; tippees are another matter.

Application of *in pari delicto* in the present case would have no effect on public policy nor would it have a deterrent effect upon anyone in the present case, since AB&T would not suffer for the actions of its officer. This would mean that only FDIC, an innocent party, would be damaged by the Court's failure to apply the doctrine *in pari delicto*.

The defenses, heretofore discussed, which Aroneck set up to plaintiff's first cause of action, have also been adopted by both defendants as defenses to the second cause of action relating to the assignment by Arrow Investment Corporation to FDIC of the note and mortgage of Henry Martin to Arrow Investment Corporation dated January 31, 1974, recorded in the R.M.C. Office for Richland County, South Carolina in Mortgage Book M–338 at page 539 securing the original principal sum of $20,000.00.

Since these defenses have already been found ineffective as to the first cause of action, said defenses would suffer the same fate as to the second cause of action and FDIC is entitled to immediate delivery of the above described note and mortgage of Henry Martin.

At the present time there is a principal balance due on the note of $34,344.49 plus interest at the rate of 8% per annum from September 3, 1974 to the present date. This interest accrues at the rate of $7.53 per day and amounts to $16,603.65. The plaintiff is also entitled to a reasonable attorney's fee as provided by the note.

FDIC has indicated that it will allow a $767.79 set-off against interest due. This represents the amount of interest above 8% collected by AB&T on previous notes of defendant Aroneck. This set-off is not required by law or under the prior provisions of this Order, but since plaintiff wishes to concede this amount, the Court will reduce the interest figure to $15,835.86.

The Court finds that an attorney's fee of $3,434.00, representing 10% of the principal amount of the note is reasonable and proper under the circumstances. The plaintiff has asked for a much larger fee and plaintiff has obviously incurred fees considerably in excess of this amount in pursuing the case to its present state. However, it is not the intent of attorney's fees allowed in a note to always cover the full amount of fees incurred in every situation. Complicated cases can arise when the principal amount of the note is very small, or large fees can be incurred because of unusual factual and legal problems or even imaginatory defenses as found in the present case. When attorney's fees are not recovered in amounts sufficient to cover the fees incurred by the holder of the note, the additional fees are just another cost of doing business.

IT IS, THEREFORE, ORDERED that the plaintiff Federal Deposit Insurance Corporation have judgment against the defendant S. N. Aroneck on the first cause of action in the amount of Thirty-Four Thousand Three Hundred Forty-Four and 47/100 ($34,344.47) Dollars representing the principal due on the note, plus Fifteen Thousand Eight Hundred Thirty-Five and 86/100 ($15,835.86) representing interest from September 3, 1974 to November 21, 1979 plus Three Thousand Four Hundred Thirty-Four and No/100 ($3,434.00) Dollars representing the attorney's fee.

IT IS FURTHER ORDERED that the defendant Arrow Investment Corporation shall immediately deliver to the attorneys for plaintiff Federal Deposit Insurance Corporation the note and mortgage given by Henry Martin to Arrow Investment Corporation dated January 31, 1974 and recorded in the R.M.C. Office for Richland County, South Carolina in Mortgage Book M–338 at page 539.

AND IT IS SO ORDERED.